KEVIN G. ROE
425 SUMMIT AVENUE
HACKENSACK, NEW JERSEY 07601
(201) 489-6777
ATTORNEY FOR DEFENDANT

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
WHITE PLAINS DIVISION

| | |
|---|---|
| In re: | CHAPTER 11 |
| RICHARDS CONDITIONING CORP.,<br>*Debtor.* | CASE NO.: 10-22507(RDD) |
| RICHARDS CONDITIONING CORP.,<br>*Plaintiff,*<br><br>v.<br><br>LAWRENCE P. HOPWOOD,<br>*Defendant.* | Adv. Pro No.: 10-08408(RDD) |

## MOTION TO ALTER, MODIFY, VACATE AND SET ASIDE ENTRY OF DEFAULT AND DEFAULT JUDGMENT

**PLEASE TAKE NOTICE** that Defendant, LAWRENCE P. HOPWOOD, hereby moves

pursuant to Fed. R. Civ. P. 55, 59, and to the extent applicable 60, and Fed. R. Bankr. P. 7002,

7055, 9023 and to the extent applicable 9024, before the Honorable Lawrence D. Drain,

U.S.B.J., for an Order to alter, amend, modify, vacate and set aside the default entered herein for

the reason that good cause exists, that relief is warranted under applicable law *In re Suprema*

*Specialties, Inc.: Gaglio v. Silverman*, 330 B.R. 40 (S.D.N.Y. 2005), *Enron Oil Corp. v.*

*Diakuhara,* 10 F.3d 90, 96 (2nd Cir. 1993) and that excusable neglect caused the delay in filing

the Answer to the Complaint as more fully appears in the Declaration of Lawrence P. Hopwood attached hereto as Exhibit A.

Defendant has a good and meritorious defense to the claims alleged in Plaintiff's Complaint, all as more fully appears from the proposed Verified Answer of the Defendant, attached as Exhibit B.

This Motion is made and based on the Proposed Verified Answer and the Declaration of Lawrence P. Hopwood and on the pleadings, papers, and records, and files in this action.

Respectfully submitted,

Kevin G. Roe
Attorney for Defendant
425 Summit Avenue
Hackensack, New Jersey 07601
(201) 489-6777 *ph.*
(201) 489-5914 *f.*
kevingroe@hotmail.com

KEVIN G. ROE
425 SUMMIT AVENUE
HACKENSACK, NEW JERSEY 07601
(201) 489-6777
ATTORNEY FOR DEFENDANT

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
WHITE PLAINS DIVISION

| | |
|---|---|
| In re:<br><br>**RICHARDS CONDITIONING CORP.,**<br>*Debtor.* | **CHAPTER 11**<br><br>**CASE NO.: 10-22507(RDD)** |
| **RICHARDS CONDITIONING CORP.,**<br>*Plaintiff,*<br><br>v.<br><br>**LAWRENCE P. HOPWOOD,**<br>*Defendant.* | **Adv. Pro No.: 10-08408(RDD)** |

## DEFENDANT'S MOTION TO VACATE DEFAULT

Defendant, Lawrence Hopwood, by and through his attorney, Kevin G. Roe, submits this Motion to vacate the entry of default and respectfully sets forth as follows:

### BACKGROUND

1.    Debtor, Richards Conditioning Corp., (was a family owned heating and air conditioning business started by Defendant, Lawrence P. Howpood's father, Martin Hopwood, in or around 1954. Defendant became employed by the company in or around 1969, working part-time while attending high school and college. He was employed on a full time basis from 1976 through March, 2008, working 52 weeks a year. Defendant's brother, Richard Hopwood, was a

business manager of various related enterprises including Allied, Task and L & M Distributors, which dealt in duct work in the heating and air conditioning industry. Richard Howpood is a shareholder of debtor, holding twenty (20 %) percent of the common stock.

2. Martin Hopwood Jr., is an Attorney at Law, who left the practice of law and joined the family business while pursuing outside overseas real estate investment interests. Although paid by debtor, Richards Conditioning Corp., the contribution of Martin to the company business is undetermined.

3. Defendant, Lawrence Hopwood, was primarily responsible for the actual bidding and project management of debtor, which yielded the primary income upon which the company survived.

4. In or about 2005, debtor engaged the services of Matthew Kolb, to provide financial consulting services and recommendations to make the company fiscally successful and develop strategical plans for future earnings. Annexed hereto as Exhibit D is the website of Matthew Kolb indicating his credentials. As part of this engagement, Mr. Kolb was to be provided all financial documents relating to debtor, as well as the various subsidiaries run by Richard Hopwood. As more particularly set forth in the Declaration of Matthew Kolb annexed hereto as Exhibit B, he was regularly frustrated in his analysis and development of a financial strategy of the debtor, due to the non-production of financial statements and expense reports by Richard Hopwood. When these materials were eventually produced, it was apparent that debtor was underwriting losses generated through the subsidiaries run by Richard Hopwood revealing them to be financially untenable. During the course of this process, it became apparent that debtor, Richards Conditioning Corp., could no longer survive, due to the unwillingness of Richard and Martin to cooperate with defendant in accepting recommendations from Mr. Kolb for changes in

the business model of debtor in order to survive. It had become apparent that the expenses paid by debtor to underwrite the mismanagement of three subsidiaries run by Richard and in addition to carrying unjustified expenses of salary and benefits paid to Martin and Richard that defendant, Lawrence Hopwood, needed to buy them out in order that debtor be made financially stable and viable.

5.   As more particularly set forth in the Declaration of Lawrence P. Hopwood annexed hereto as Exhibit A, in or about March 2008, Defendant offered to buy the interests of Martin and Richard, which offer was rejected, and met with a counter-offer to buy out the interests of Lawrence. This prompted a series of negotiations between the brothers, mediated by Matthew Kolb, which eventually led to the acceptance by Lawrence Hopwood of a proposal made by Martin and Richard. Annexed hereto as Exhibit C are email correspondences verifying the existence and terms of the proposed buyout, which although never formally reduced to writing, became fully implemented by the conduct of the parties, confirming and ratifying the terms and details thereof.

## ENTRY OF DEFAULT SHOULD BE VACATED AS DEFENDANT HAS MET HIS BURDEN UNDER FRCP 55

6.   Federal Rule of Civil Procedure 55(c) (made applicable by Fed. R. Bankr. P. 7055) provides that "[f]or good cause shown the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with Rule 60(b)." Rule 60(b) imposes the more stringent standard of "excusable neglect" for vacating a judgment.

7.   It is well established that the standard for setting aside the entry of a default pursuant to Rule 55(c) is less rigorous than the "excusable neglect" standard for setting aside a default judgment pursuant to Rule 60(b). *Meehan v. Snow,* 652 F.2d 274, 276 (2d Cir.1981). However,

in making a determination under either rule, the factors to be taken under consideration are essentially the same. Specifically, a court should consider whether the default was willful, whether the defendant has a meritorious defense, and whether setting aside the default would prejudice the non-defaulting party. *Sony Corporation v. Elm State Electronics, Inc.,* 800 F.2d 317, 320 (2d Cir.1986) (Rule 55(c)); *Davis v. Musler,* 713 F.2d 907, 915 (2d Cir.1983) (Rule 60(b)(1)). Courts have also considered whether entry of a default judgment would lead to a harsh result or to the entry of a large sum of money. *Horn v. Intelectron Corp.,* 294 F.Supp. 1153, 1155 (S.D.N.Y.1968). As a matter of policy, there is a strong preference for resolution of disputes on their merits. *Meehan,* 652 F.2d at 277.

### Defendant exhibits good cause to vacate the default.

8. In determining whether good cause exists, a court must evaluate: (i) the willfulness of the default, (ii) the prejudice to the adversary if the default is set aside, and (iii) whether the defendants present a meritorious defense. *Traguth v. Zuck,* 710 F.2d 90, 94 (2d Cir.1983) (citing *Meehan,* 652 F.2d at 277). A default may be vacated upon a showing that the three factors on balance support relief. *See Grant v. City of New York,* 145 F.R.D. 325, 326 (S.D.N.Y.1992). Moreover, the court's discretion is narrow in light of the "strong policies favoring the resolution of genuine disputes on their merits," and the admonition that "doubts are to be resolved in favor of a trial on the merits." *Traguth,* 710 F.2d at 94 (citations omitted). As more particularly set out in the supporting Declaration of Lawrence P. Hopwood and below, it is respectfully submitted that Defendant exhibits good cause to vacate the Clerk's entry of Default.

### Defendant's Failure to Answer was not Willful

9. When determining the willfulness of a default, the Second Circuit has clearly held that carelessness and negligence do not constitute willfulness for the purpose of a default judgment.

See *American Alliance Insurance Co.,* 92 F.3d at 61 (refusing to find willfulness in the default judgment context where defendant's failure to answer was due to a filing clerk's error in misplacing the complaint); *Sims v. West,* 2005 WL 2241066 at (W.D.N.Y.2005) (refusing to find willfulness where defendant failed to answer the complaint because of a mistaken assumption that he was represented by the New York State Attorney General's office); *Jones v. Herbert,* 2004 WL 3267285 at (W.D.N.Y.2004) ("The Second Circuit looks for bad faith or for at least something more than mere negligence before rejecting a claim of excusable neglect based on an attorney's or a litigant's error.").

10. In the case *sub judice,* defendant is an inexperienced litigant who now finds himself involved in several lawsuits as a result of his prior association with the Debtor. The defendant works long hours daily making it nearly impossible to meet with and retain counsel. Handling the different lawsuits became confusing and overbearing for Defendant. Although Defendant eventually met with an attorney, he was unable to timely retain an attorney. In addition to the financial problems Defendant had in retaining an attorney, Defendant confused the filing deadline in this case resulting in the expiration of the time permitted to file an Answer.

11. Under the facts of this case, there is no indication that Defendant's failure to answer was deliberate, the result of bad faith, or intended to cause undue delay or harassment. Furthermore, upon learning of the Motion to enter a default judgment, Defendant quickly made arrangements to contest same and filed timely opposition.

**Prejudice to Plaintiff**

12. It can hardly be said that the Debtor would suffer prejudice by allowing Defendant to file an Answer and vacate a default less than thirty (30) days following entry of same and less than ninety (90) days from the filing and service of the Complaint. The Court has not entered a

default judgment and as such the standard in deciding to vacate is less rigorous than the standard

applied when deciding to vacate a default judgment. *See Pecarsky v. Galaxiworld.com Ltd.*, 249

F.3d 167, 171 (2d Cir.2001); *American Alliance Insurance Co. v. Eagle Insurance Co.*, 92 F.3d

57, 59 (2d Cir.1996). The Clerk's default was entered on October 25, 2010. This minimal delay

has not prejudiced the Plaintiff's case. However, an entry of a default judgment will provide an

inequitable advantage to the Plaintiff and will allow Mr. Hopwood's defense to be defeated

without the difficulty involved in contesting the issues on the merits. Specifically, the Debtor

seeks a judgment in excess of $430,000.00, a life altering amount to Defendant and his family,

considering their current financial condition. Simply put, the inequitable result of entering a

default judgment far outweighs any alleged prejudice to Plaintiff occasioned from the minimal

delay in filing an Answer.

### Presence of a meritorious defense

13. Whether a meritorious defense is presented, requires only that the defendant meet a

"low threshold." *Meehan v. Snow*, 652 F.2d 274, 276-77 (2d Cir.1981). Here, the Defendant

denies most material allegations and stands ready to assert several affirmative defenses.

14. As more particularly set out in the Declaration of Lawrence P. Hopwood, Debtor

entered into a buyout agreement in which Defendant was to relinquish all of his ownership

interest in Debtor. The existence of a buyout agreement, as compared to the severance package

with retention of an ownership interest, as alleged by Debtor to the Court by Defendant's

brothers, is a meritorious defense to the allegations contained in the Complaint and certainly

meets the "low threshold" requirement of *Meehan*.

**Equity Supports a Denial of an Entry of a Default Judgment**

15.   Defendant contests almost every material fact alleged in the Complaint and specifically disputes the information provided to the Examiner and the findings of same.

16.   A review of the totality of the circumstances and applying the facts at hand to the above factors, giving due regard to the Court's strong policy favoring a resolution of genuine disputes on their merits and the admonition that doubts are to be resolved in favor of a trial on the merits, it is respectfully submitted that this Defendant has met the burden of FRCP 55 to vacate the Clerk's entry of default.

### PROPOSED RELIEF

17.   Judgment, in the form substantially similar to the judgment annexed to Defendant's Motion as Exhibit E, should be entered by the Court and allow Defendant a short period of time to file an Answer.

### CONCLUSION

18.   For the reasons set forth herein, the entry of default against the Defendant should be vacated in the form annexed hereto as Exhibit E.

Dated: Hackensack, New Jersey
       November 30, 2010

Respectfully submitted,

KEVIN G. ROE

/s/ Kevin G. Roe
Counsel for Defendant
425 Summit Avenue
Hackensack, New Jersey 07601
(201) 489-6777
kevingroe@hotmail.com

# EXHIBIT A

**KEVIN G. ROE**
**425 SUMMIT AVENUE**
**HACKENSACK, NEW JERSEY 07601**
**(201) 489-6777**
**ATTORNEY FOR DEFENDANT**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**WHITE PLAINS DIVISION**

| | |
|---|---|
| **In re:** | **CHAPTER 11** |
| **RICHARDS CONDITIONING CORP.,** *Debtor.* | **CASE NO.: 10-22507(RDD)** |
| **RICHARDS CONDITIONING CORP.,** *Plaintiff,* | |
| **v.** | **Adv. Pro No.: 10-08408(RDD)** |
| **LAWRENCE P. HOPWOOD,** *Defendant.* | |

STATE OF NEW JERSEY          )
                                              : ss:
COUNTY OF BERGEN           )

**DECLARATION OF LAWRENCE P. HOPWOOD**

**LAWRENCE P. HOPWOOD** declares and states:

1. I am the defendant in the above matter and make this Declaration in support of my application to vacate any default heretofore entered against me for the reasons more particularly set forth below. I have personal knowledge of the facts alleged herein based upon the events leading up to my relinquishment of any and all ownership interest in the Debtor and pursuant to a buyout agreement entered and performed.

### GOOD CAUSE EXISTS TO VACATE THE DEFAULT

2. I received a copy of a Summons and Complaint in this matter sometime in late August
2010 at a time in which I was in the midst of defending numerous lawsuits including, but not
limited to a claim by All Points Capital, a leasing company for shop equipment, in which I was
required to be a personal guarantor for Debtor, Richards Conditioning Corp., (hereinafter
"Debtor"); a suit by Davis and Warshaw, a plumbing supply house of Debtor in which I was also
required to sign as a personal guarantor; a suit by #38, Sheet Metal Workers International
Association Local Union (S.M.W.I.A.L.U.), arising from non-payment of Debtor's contribution
to fringe benefits on behalf of workers. These claims arose out of a long term mismanagement
of the business of Debtor at the hands of my brothers, Martin Hopwood Jr. and Richard
Hopwood whose responsibility included the day to day financial operations of Debtor. All of
these lawsuits were commenced following my departure from Debtor pursuant to a buyout
agreement between myself and my brothers negotiated prior to my leaving in March 2008. I was
forced to retain two different law firms to defend against these claims, in addition to filing a *pro
se* Answer with regard to the S.M.W.I.A.L.U. lawsuit. All of these actions are still pending. In
addition, I am presently defending two separate foreclosure actions *pro se* and face the imminent
filing of a third.

3. Since leaving Debtor, I have become employed by an independent concern known as
the Right Connection Plumbing and Heating, where I am a project manager working on average
nearly eighty (80) hours a week. At the same time, I have two children attending college on a
full time basis and I am barely able to meet my basic household necessities. When I received a
copy of adversary proceeding, I was without available funds necessary to retain counsel to file

responsive pleadings to the Complaint. I was referred to Mr. Kevin G. Roe, through a friend at work who agreed to look at the pleadings from the adversary proceedings and contact the Debtor's lawyer on my behalf. Between my work schedule, which prevented any meeting during regular business hours and Mr. Roe's availability, I was only able to meet him in early October 2010. After meeting Mr. Roe, he agreed to contact counsel for Debtor which he did and was provided the examiner's report which supposedly forms the basis of the within action. Unfortunately, the examiner's report fails to disclose the entire story of the problems with Debtor based on the fact that the examiner was only provided with selective information by my two brothers, which was part of the major underlying reason for my departure from Debtor. The loans allegedly made by my brothers are illusory and disclose a pattern of self dealing most suspicious under circumstances. By the time I was able to meet with Mr. Roe a second time, the attorney for Debtor had moved for a hearing on their request for an entry of default which was scheduled for November 23, 2010. Once again, due to the demands of my job, attention to other lawsuits described above and my limited resources to retain new counsel to defend this action, I was only able to meet with Mr. Roe and make arrangements for him to appear on my behalf and did not have the time to more fully present my position as set forth below. It is respectfully submitted to this Court that the circumstances above, constitute sufficient just cause to allow me to appear and defend against this action. This was not simply ignoring papers received by me, but rather an effort to locate counsel and meet with him under the most arduous of personal and financial circumstances.

## ABSENCE OF PREJUDICE TO DEBTOR

4. It is respectfully submitted to this Court that the Debtor will suffer no prejudice by allowing me to appear and defend against this action. Instead, it is necessary for this Court to

understand the full facts and circumstances surrounding the insolvency of Debtor occasioned as a result of the mismanagement of my brothers, Martin Hopwood Jr. and Richard Hopwood. Moreover, the Court should be aware that my brothers have purposely misrepresented my status to the Court as a "shareholder": of the Debtor, knowing full well that doing so would make me liable for reimbursement to Debtor of monies rightfully paid to me as part of a buyout agreement. In fact, my brothers have perpetrated a fraud upon the Court by misrepresenting me to be an owner or "insider" who would be liable for such repayment if this were true, which it is not. Furthermore, a careful review of the examiner's report, even based upon the limited information provided, reveals that my brothers are more answerable under the theory upon which they proceed than anyone. It can hardly be said that the Debtor would suffer prejudice by allowing Defendant to file an Answer and vacate a default less than thirty (30) days following entry of same and less than ninety (90) days from the filing and service of the Complaint, particularly, in light of all of the circumstances herein.

## A MERITORIOUS DEFENSE EXISTS

5. I had been employed by Debtor since working part-time through high school and college during which I learned the heating and air conditioning business. In 1976, I became employed on a full time basis performing service and maintenance on residential, commercial and industrial systems. I was responsible for the installation, service and repair of heating and air-conditioning systems which work I performed for five to six years. Thereafter, I became more involved in the sheet metal and drafting of system designs for commercial and industrial ventilation systems which work I performed for the next ten to twelve years. During this phase of my career, I was afforded the opportunity to comprehensively learn the industry from sheet metal fabrication to system design and installation as well as maintenance and service. During

this period I moved through the journeyman classification to the point where I was accepted in the union with full mechanic status. From this point, I moved into a managerial position which included manpower supervision, bidding and estimating, procurement and purchase of equipment and overall supervision of all contracts and projects.

6. Meanwhile, my brother Martin Hopwood, pursued a fledgling legal career where he was phased out when he failed to make partner and pursued a second unsuccessful career in real estate development where once again he was forced out. He thereafter sought refuge in the family business, claiming himself to be capable and worthy of an upper management position, seeking equal status and compensation that I had earned over many long years of hard work. Once in this position, benevolently conferred by my parents, Martin continued his ineptitude in managing the day to day financial affairs of Richards Conditioning Corp. and its other subsidiaries run by my brother Richard Hopwood Jr. This role continued for approximately ten (10) years, during which time the business of Richards Conditioning Corp. grew to the extent that his mismanagement was not readily apparent, or successfully concealed, due to poor record keeping with no accountability. Martin's tenure commenced in or around 1996 and continued until 2006, when I approached him insisting that the business had to move forward and become more profitable by engaging in regularized business and accounting practices to allow the growth which I had developed over the past twenty (20) years. To this end, the Debtor engaged the services of Mr. Matthew Kolb, an individual with extensive background and expertise in financial matters. Mr. Kolb thereafter worked for Debtor for the next two (2) years during which time he encountered substantial resistance and lack of cooperation from Martin in producing timely financial statements necessary to conduct a proper evaluation and analysis of the Debtor. The information provided was usually incomplete and failed to comply with general accepted

accounting practices normally observed. It was during this time that Mr. Kolb discovered that the business of the Debtor was compromised and imperiled through excessive overhead and executive compensation, and the underwriting of subsidiaries run by my brother Richard Hopwood. It was upon this discovery that it became clear to me that the business of the Debtor could not survive through such excessive compensation, including country club memberships, automobiles and the like, while at the same time underwriting the three failed subsidiaries run by my brother Richard Hopwood. These subsidiaries, L & M Distributors, Allied Products and Task U.S.A., all wholesale distributors of heating and air-conditioning products, failed to compete in the open market and were nothing more than safe havens to keep my brother Richard employed.

7. In March 2008, it had reached the point where I was prepared and made an offer to buy out my brothers' interest in the family business, realizing that my efforts were responsible for whatever positive cash flow the business of Debtor was able to generate. To this end, I made an offer to buy my brothers out, which offer was rejected, but met with a counter-offer to buy my interests out, which I eventually accepted. Mr. Matthew Kolb acted as mediator between my brothers and I in arriving at terms mutually acceptable to all. Mr. Kolb acted as a go between in the negotiation of this buyout, the terms of which became memorialized in a series of emails which are annexed hereto. The emails were directed to and between my attorney at the time, Mr. David O. Fuller Jr. of Bosworth, Gray and Fuller and Glenn Backer, Esq. on behalf of my brothers. These emails clearly and specifically refer to a buyout agreement in which I was to relinquish all of my ownership interest in Debtor as compared to the severance package with retention of an ownership interest as misrepresented to the Court by my brothers. Notably, the

word "severance" never appeared in any email in which the buyout agreement was explicitly described and referenced.

8. The foregoing should amply demonstrate to the Court that I had relinquished all ownership and control of the Debtor and was paid pursuant to a schedule agreed to and performed by my brothers who retained ownership and control of Debtor. After March 2008, I was no longer an "insider" whereby any payments made to me are subject to avoidance and reimbursement to the Debtor. Any characterization to the contrary by my brothers is simply untrue as they surely would never have paid the sums in question unless in exchange for my relinquishment of ownership of the Debtor. The sad truth is that Debtor became insolvent following my departure from the company due to the fact that I was the only individual responsible for positive cash flow into the Debtor which kept it solvent for the many years prior to my departure.

9. I have read the plaintiff's motion papers, pleadings and supporting documents and as stated more fully herein, I dispute the statements contained therein.

10. I have read the above statement and it is true and accurate to the best of my knowledge and recollection.

Dated:   November 29, 2010

LAWRENCE P. HOPWOOD

# EXHIBIT B

KEVIN G. ROE
425 SUMMIT AVENUE
HACKENSACK, NEW JERSEY 07601
(201) 489-6777
ATTORNEY FOR DEFENDANT

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
WHITE PLAINS DIVISION

| | |
|---|---|
| In re: | CHAPTER 11 |
| RICHARDS CONDITIONING CORP., *Debtor.* | CASE NO.: 10-22507(RDD) |
| RICHARDS CONDITIONING CORP., *Plaintiff,* | |
| v. | Adv. Pro No.: 10-08408(RDD) |
| LAWRENCE P. HOPWOOD, *Defendant.* | |

STATE OF NEW JERSEY    )
                       : ss:
COUNTY OF BERGEN       )

## DECLARATION OF MATTHEW KOLB

**Matthew Kolb** declares and states:

1. I was engaged by Debtor, Richards Conditioning Corp. (hereinafter "Debtor"), from 2006 to March 2008, as an independent consultant and financial advisor to determine and establish a business plan to help the company to grow and become profitable. I worked approximately twenty (20) hours a week and have personal knowledge of the facts alleged herein.

2. It was my function to perform a cost analysis based upon review of financial records kept and maintained by Debtor in the ordinary course of its business. I was called upon to conduct a financial analysis of the bidding process at the request of Lawrence P. Hopwood together with his brothers in order to help organize the company to allow future growth. My job included a review of their accounting practices as well as inventory management and human resource development.

3. Throughout the course of my tenure with the Debtor, I repeatedly encountered frustration and delay through the untimely production of financial statements and job cost analysis, which were usually incomplete, inaccurate and misleading. Repeated requests of Martin Hopwood, the Chief Financial Officer and Chief Operating Officer of Debtor, were typically unanswered or were met with excuses for their non-production. The financial statements which were produced were prepared by William Levine, and failed to comport with generally accepted accounting principles necessary for a meaningful and comprehensive analysis. The reports supplied failed to include any accurate accounting system, contained no financial statements and failed to include records of family transactions which Martin was unable or unwilling to correct. What the reports revealed were constant problems with managing the cash flow between accounts payable and receivable, ultimately revealing the precarious financial condition of Debtor. When alerted to this problem, Lawrence Hopwood insisted upon explanations underlying the cash flow problems, only to be told by Martin Hopwood that the company needed to borrow money in order to grow. To this end, Martin Hopwood arranged for yet another refinance of the Debtor's property located on Marbledale Road to ease the cash flow problem. In addition, Martin Hopwood arranged to factor the Debtor's receivables through a third party in return for advance payment. All of the foregoing was over Lawrence P.

Hopwood's objection which he expressed at many meetings in which Martin Hopwood insisted that corporate growth was impossible without borrowing.

4. The business relationship between Lawrence P. Hopwood and his brothers had come to the point that the company could no longer continue and that a buyout was the only answer. I was requested to serve as the go between in negotiating the terms of a buyout between Lawrence P. Hopwood and his brothers. It was fully understood that Lawrence P. Hopwood no longer wanted any part of the Debtor and a determination was made to value Lawrence's interest in the business and convert same into a buyout over a five (5) year period following which his interests would be fully paid for. Lawrence P. Hopwood clearly stated his full expectation of terminating any and all ownership in the Debtor, including stock transfer and relief from all company debt.

5. I have reviewed the annexed series of emails exchanged between the parties and their lawyers which comports with my recollection of the terms discussed and ultimately agreed upon between the parties. The agreement entered fully contemplated a buyout of Lawrence P. Hopwood's interest in the Debtor's business by his brothers, and was not a mere severance of an employment relationship with the retention of any ownership interest in the Debtor by him.

6. I have read the above statement and it is true and accurate to the best of my knowledge and recollection.

Dated:  November 30, 2010

MATTHEW KOLB

# EXHIBIT C

From: "Larry Hopwood" <Larry@richardsconditioning.com>
Subject: **022908-RCC-LPH AGAINST RH & MH**
  Date: March 1, 2008 7:25:44 AM EST
    To: "Matt Kobb" <coldspring2750@optonline.net>, "Kerry Hopwood" <KEFHY@aol.com>

1.) DO NOT RESPOND
2.) SEE BELOW
3.) MATT-IF YOU OUT TODAY CAN YOU STOP HERE AT THE OFFICE TO TALK TO JED (THE NEW MEDIATOR) AND TO ME I
   WOULD ONLY KEEP YOU FOR 30 MINUTES.
4.) YESTERDAY WAS ARMAGEDDON. I DID ANOTHER WALK OUT AND THREATENED THEM AS YOU CAN SEE FOR YOURSELF.
5.) MATT YOU CAN CALL ME AT THE OFFICE.
6.) MARTY IS IN THE CAYMAN ISLANDS
7.) JED CONTENDS THAT RH & MH HAVE SEEN THE LIGHT AND THEY ACKNOWLEDGE THE ERRORS OF THE PAST. THEY WILL
   DIVULGE THE TRUTH ABOUT EVERYTHING THAT I SUSPECTED AND EVERYTHING THAT WAS A SECRET THAT I DID NOT
   KNOW ABOUT.
8.) RH & MH ADMITTED THAT THE SECRETS HAVE BEEN NUMEROUS AND THAT THE WHOLE BOOK OF LIES IS EVEN
   GREATER THAN I AM GUESSING.
9.) *S*U*P*P*O*S*E*D*L*Y* THE DOCUMENTATION ****IS**** AVAILABLE.
10.) SUPPOSEDLY MY FATHER PAID BACK SOME KIND OF DOLLAR AMOUNT YESTERDAY TO COVER A DEBT THAT HAS
   SOMETHING TO DO WITH TASK/ALLIED/AUS/L&M ETC.......
THE DEEPER I GET INTO THIS THE MORE CONFUSED I GET AND THE MORE ((U P S E T T I N G)) THIS MESS IS TO ME.
I GUESS WHAT I AM SAYING IS I NO LONGER CAN OBJECTIVELY SEPARATE THE TRUTH FROM THE LIES AND THE BULLSHIT.
I NEED HELP.
LARRY

**From:** Larry Hopwood
**Sent:** Friday, February 29, 2008 9:38 AM
**To:** Martin M. Hopwood, Jr – RCC
**Subject:** RE: Advances to RCC

Ok next Friday I am gone.

**From:** Martin M. Hopwood, Jr – RCC
**Sent:** Friday, February 29, 2008 9:37 AM
**To:** Larry Hopwood
**Subject:** RE: Advances to RCC

No unilateral decisions.

**From:** Larry Hopwood
**Sent:** Friday, February 29, 2008 9:35 AM
**To:** Martin M. Hopwood, Jr – RCC
**Subject:** RE: Advances to RCC

My way or I am out next week on Friday.

**From:** Martin M. Hopwood, Jr – RCC
**Sent:** Friday, February 29, 2008 9:33 AM
**To:** Larry Hopwood
**Cc:** Rich Hopwood – RCC
**Subject:** RE: Advances to RCC

*I totally disagree and we can have a meeting anytime you want with Accountants, Matt and Bill Griffin. The reason the money had to
go in is the jobs are not making money. Do I make mistakes yes. We all do. I want to fix it and go forward.*

*It is not just your way it is 5 shareholders.*

*I copied Donna because you wanted verification of the amounts that went in RCC. She already knows these figures.*

From: Larry Hopwood

**From:** Larry Hopwood
**Sent:** Friday, February 29, 2008 9:15 AM
**To:** Martin M. Hopwood, Jr - RCC
**Cc:** Rich Hopwood - RCC
**Subject:** RE: Advances to RCC
**Importance:** High

Where did the cash go for the last several years under your supervision—provide a breakdown????????????

**From:** Larry Hopwood
**Sent:** Friday, February 29, 2008 9:11 AM
**To:** Martin M. Hopwood, Jr - RCC
**Cc:** Rich Hopwood - RCC
**Subject:** RE: Advances to RCC

Ok----------you started this again.
BY PUTTING THIS IN WRITING TO Donna Carr here is my response.
    1.) You and Rich have mismanaged the operation and the finances in these companies for years.
    2.) You can blame me all you want.
    3.) I will leave tomorrow if you want.
    4.) I will dissolve all agreements and finances today.
    5.) I will continue RCC on my own under a separate name
    6.) Lets bring in the accounts and the bank and MATT discuss the financial management of this company
    7.) Lets discuss wages as compared to actual job descriptions.
    8.) Lets discuss the relative importance of each individual to the survival of this company.
    9.) Is AUS still an expense.
    10.) Is L&M still an expense,
    11.) Is Task still an expense?
    12.) Is Allied still an expense.
    13.) Is HFP still a scam?
    14.) Are the whole financial workings of RCC a convoluted mess of bullshit?
    15.) Were there several hundreds of thousand of dollars wasted on entertainment expenses and over paid employees salaries and mismanaged employees?
    16.) Is the overhead in RCC too high to compete?
    17.) Is the RCC overhead to high to make a profit?
    18.) Are the management salaries and perk abuses by you and Rich and the foreman too high?
I make estimating errors all day long. I make decision mistakes all day long. I know and can admit to my mistakes.
I also do the bidding, the labor estimating, the equipment bid comparisons, the daily service manpower, the job manpower for all trades, the change orders, service contracts, design of sheet metal systems-steamfitting systems, hot----chilled----steam----air----underground pipe or duct, radiant heat, boilers, generators, etc.......... buyouts, cad management, drawing coordination, project management, project problem solving, control installation supervision and start up coordination, project close out and all punch lists, meet with customers, handle all technical issues, I survey jobs that have technical problems, I have filed experience in service, sheet metal, piping, insulation, I can install everything that we do in the field, I can fix everything we install----------now you say we are equals.
I do not have time for your bullshit anymore.
You and rich buy me out or begin finding other employment.
So ----my way or I am leaving.
I never put money up because you two had this place all fucked up.
NOW WHO IS IN THE MESS????????????? The two you or me?????????
IT IS YOUR CALL NOW.
THE DEBT WAS A RESULT OF MISMANAGEMENT BY YOU AND RICH AND ALL THE TAKE AND NOTHING ON THE GIVE.

**From:** Martin M. Hopwood, Jr – RCC
**Sent:** Friday, February 29, 2008 8:24 AM
**To:** Larry Hopwood
**Cc:** Carr, Donna; Marlow, Patty; Rich Hopwood - RCC
**Subject:** Advances to RCC

Attached is a summary of all XXXX *loan* to RCC (net of any repayments) made by MMHJR and RJH to RCC that you *(bullshit)* requested. Please note this schedule was prepared by me with the documented information given to me by HVB from its records. The Bank can verify all these transactions. I have also attached a PDF copy of below.

From: "Larry Hopwood" <Larry@richardsconditioning.com>
Subject: **FW: retainer**
Date: March 13, 2008 3:41:12 PM EDT
To: "Kerry Hopwood" <KEFHY@aol.com>
📎 1 Attachment, 72.5 KB  ‹ Save ▾ ›

**From:** Glenn Backer [mailto:gbackerlaw@aol.com]
**Sent:** Thursday, March 13, 2008 3:33 PM
**To:** Rich Hopwood - RCC
**Subject:** retainer

see attached

Glenn Backer, Esq.
292 Madison Avenue (22nd floor)
New York, New York 10017
Tel. (212) 686-7644
Fax. (212) 685-2425

**Supercharge** your AIM. Get the AIM toolbar for your browser.



HOPWOOD-...pdf (72.5 KB)

# Glenn Backer

*Attorney At Law*
*292 Madison Avenue (22nd Floor)*
*New York, New York 10017*

*Tel: (212) 686-7644*
*Fax: (212) 685-2425*
*gbackerlaw@aol.com*

March 13, 2008

**BY E-MAIL AND BY MAIL**

Mr. Richard J. Hopwood                    Martin Hopwood, Esq.
L&M Distributors, Inc.                     L&M Distributors, Inc.
80 Marbledale Road                        80 Marbledale Road
Tuckahoe, New York 10707                  Tuckahoe, New York 10707

> **Re:   Richards Conditioning Corp., L&M Distributors, Inc. and Hopwood**
> **Family Partnership**

Dear Richard and Martin:

This will confirm that you have retained Timothy F. Willert, as corporate counsel, and me to represent you with respect to the dispute with your brother Larry Hopwood and its impact on the above-referenced corporations and partnership.

Tim expects to perform, among other things, the following work:

1)   Review all available corporate tax returns and any other existing corporate documents   setting forth information about shareholders, number of shares, officers, directors, or related agreements;

2)   Order certified copies of the Certificate of Incorporation from the Department of State;

3)   Review the family partnership agreement evidencing ownership of the property and establish title;

4)   Review your emails to me stating all your recollections about the number of shares and/or corporate structure;

Mr. Richard J. Hopwood
Mr. Martin Hopwood
March 13, 2008
Page 2

     5)     Order replacement corporate kit with new share certificates and corporate seal, if necessary;

     6)     Draft by-laws, minutes, notices to shareholders and attend shareholder and director meetings for necessary shareholder corporate action to bring the corporation into compliance with shareholders' understanding of past corporate structure and update similar corporate records of L&M Distributing Inc.;

     7)     Draft any agreements, trusts or other instruments requested by vote of shareholders or desirable in estate planning.

Take all action necessary to protect you, your father and mother, the two corporations and the partnership against your brother Larry.

In consideration for our services, you have agreed to pay us at the rate of $275 per hour.

You shall be responsible for all disbursements including, but not limited to, messenger service, overnight deliveries, photocopying, long distance telephone calls, postage, court reporter fees, transportation, etc.

I will send you a monthly bill for legal fees and disbursements which will include my time and Tim's time. You have agreed to keep the monthly invoices current by payment thereof within 30 days after receipt.

In the event a dispute arises relating to my fees, you may have the right to arbitrate the dispute pursuant to Part 137 of the Rules of the Chief Administrator of the Courts, a copy of which will be provided to you upon request.

Mr. Richard J. Hopwood
Mr. Martin Hopwood
March 13, 2008
Page 3

   If the foregoing is acceptable, please sign a copy of this retainer agreement and return it in the enclosed stamped self-addressed envelope.

      Very truly yours,

      *Glenn Backer*

      Glenn Backer

      *Timothy F. Willert*

      Timothy F. Willert

**CONSENTED TO AND AGREED:**

_____

**RICHARD J. HOPWOOD**

_____

**MARTIN HOPWOOD, ESQ.**